UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARILYN BROWN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 4:19-cv-01864-MTS |
| ) | |
| ADAMS AND ASSOCIATES, INC., et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM AND ORDER**

Plaintiff LaShanté Wade was hired by Defendant Adams and Associates ("Adams") in October 2016. Adams is a Job Corps Center Operator, contracting with the United States Department of Labor to run various Job Corps Centers in the United States. Adams operated the St. Louis Job Corps Center (the "Center") for the entirety of Wade's employment there. In June 2017, Wade played a role in reporting a claim of sexual harassment against Timothy Chambers, the Center's director at the time. She was fired in August 2017 because, her supervisors claim, she was insubordinate and her work performance was unsatisfactory. Wade then filed this action, claiming that Adams and Defendant Timothy Chambers violated the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010–213.137, by firing her in retaliation for reporting the sexual harassment claim against Chambers. Defendants now move for summary judgment on Wade's retaliation claim. The Motion is fully briefed and ready for adjudication. For the reasons that follow, the Court will deny Defendants' Motion.

**I.      Background**

Job Corps Centers provide educational and career-oriented services for young individuals. On October 10, 2016, Adams hired Wade to the position of admissions supervisor at the Center.

1

Wade's tasks in that position included improving enrollment, meeting arrival goals, recruiting the Center's students, and supervising admissions counselors. Docs. [73-3], [78] ¶¶ 7, 9. In this position, Wade reported to both the admissions director and the Center director. Dwayne Barefield served as the admissions director from the date Wade was hired until he left the Center in July 2017, after which Crystal Frizzell Heimback assumed the same role for the remainder of Wade's employment at Adams. Timothy Chambers was hired as the Center director in January 2017 and remained in that role through the time of Wade's firing.

Around early June 2017, an admissions counselor supervised by Wade made a complaint to Wade and Barefield that Chambers had inappropriately harassed her. Doc. [78] ¶ 35. Barefield reported the employee's complaint to Rodney Butler, a corporate executive director at Adams, around June 1, 2017. *Id.* ¶ 36. Shortly thereafter, Butler came to the Center and asked Barefield and Wade to prepare a jointly written statement about the employee's complaint, which they did. *Id.* ¶ 37. Butler additionally spoke with the employee and Chambers about the complaint. After Butler collected this information, Adams apparently conducted an investigation of the employee's claims against Chambers but could not "substantiate the complaint." Doc. [67-6]. Chambers was unaware of Wade's involvement in the complaint against him at this time. Docs. [81-4] at 107:11–108:21, [91] ¶¶ 180–81.

In July 2017, Adams looked to hire a replacement for Barefield, who had been planning to leave the Center since early 2017. Doc. [78] ¶ 40. Barefield agreed to work at Adams until his replacement was found. Wade interviewed to replace Barefield as admissions director, but Chambers instead selected Heimback, an outside hire, for the position. *Id.* ¶¶ 44–45. Heimback started in mid-July 2017. Barefield stayed at the Center for at least two weeks after Heimback's hiring to help transition Heimback into her new role. *Id.* ¶ 47. Afterward, though Barefield left

the Center, he remained an Adams employee and currently works at a different Job Corps Center run by Adams. *Id.* ¶ 48.

After starting at Adams, Heimback felt that Wade and the admissions counselors Wade supervised were unprofessional, apparently leading Heimback to believe Wade was not setting a good example. Docs. [67-4] at 33–36, [78-2] at 5–6. Specifically, Heimback testified that (1) one employee slammed an office door in her face; (2) another refused to shake Heimback's hand and suggested he or she would not report to her; (3) she led a meeting where admissions team members were disrespectful to her in a variety of ways; and (4) one counselor mocked Heimback for being a vegetarian. Doc. [73] ¶¶ 50–55. According to Heimback, Wade did not reprimand her counselors for any of these actions. *Id.* ¶¶ 52–53, 55–56. Wade, meanwhile, contends that none of this occurred, or in any case, she did not observe any such behavior. *See* Docs. [78-7] ¶¶ 7–9, 14–15, 17–19, [78] ¶¶ 50–51. In her deposition, she further claimed that "[w]hen Ms. Heimback asked for my help, I provided it," and she never refused to do anything Heimback asked her to do. *Id.* ¶¶ 5, 12; *see also* Doc. [78-2] at 43:12–44:2.

Shortly after assuming her new position, Heimback provided Wade with a letter detailing her expectations. Doc. [80] ¶ 338. Wade wrote "unrealistic" next to one of the listed expectations, *id.*, which Heimback claims she found "very unprofessional." Doc. [67-4] at 27–28. Heimback also testified that Wade "refused to sign or acknowledge" the letter of expectations. Doc. [73] ¶ 67. But Wade disputes this, saying that she never refused to sign the letter and in fact discussed it with Heimback. Doc. [78] ¶ 67, [79-2] at 133:10–25. Then, around August 2, 2017, Chambers gave Wade a written warning because of a "continued failure to achieve assigned file submittal quotas," which was, according to the letter, adversely affecting the Center. Doc. [73-9]. The warning made no mention of any of the claimed insubordination issues. *See id.* A week later, on

3

August 9, Wade responded to the written warning, sending a copy of her response to Chambers and Kim LaGrand-Moorehead, an Adams HR manager who started working at Adams in July 2017.  Docs. [73-10], [91] ¶ 23.  In the response, Wade suggested that understaffing played a role in the file deficit cited in the warning.  In doing so, she noted that one of her employees "abruptly resigned on June 5th" due to sexual harassment in the workplace, disclosing that she and Barefield had reported the complaint to Butler, though not mentioning who the employee had accused or any other details.  *Id.*

There was an incident on August 10, 2017 where Wade left the Center for four hours.  Heimback testified that Wade did not answer her cell phone and that when she returned she could not provide a reason explaining her absence.  Wade disputes this, asserting that she was at a required outreach event with another employee, which she told Heimback when she arrived back at the Center.  *Compare* Doc. [67-4] at 57:23–58:6 *with* Doc. [79-2] at 177:14–178:16.  Wade further testified that her shared calendar reflected the outreach event, which would have provided Heimback with advance notice that she would be at the event.  Doc. [79-2] at 177:14–178:16.

Another disputed incident occurred on August 15, 2017, when numerous former Job Corps students who were reapplying to the program did not show up for required meetings with Chambers.  Doc. [78] ¶ 80.  There is a disagreement as to how Wade explained these absences.  Heimback testified that Wade simply told her that the counselors "didn't know about the meetings" and thus did not schedule them; however, Heimback claimed that the admissions counselors told her the students were just no shows.  Doc. [67-4] at 58:7–2, 130:6–15.  Heimback apparently viewed Wade's explanations for the absences as Wade "lying" and "being deceitful," as it was her responsibility to ensure the students showed up for these meetings.  *Id.* at 128:11, 130:19–131:17.

But Wade testified that her explanation for the absences was consistent with what the admissions counselors told Heimback.  Doc. [79-2] at 179:19–180:19.

In a memorandum dated August 15, 2017 and sent to LaGrand-Moorehead, Heimback requested to fire Wade.  Doc. [73-11].  In support of the request, Heimback stated Wade was "insubordinat[e]" in front of other staff and specifically noted the following disputed events: (1) her claim that Wade "refused to sign the letter of expectation;" (2) Wade's August 10 absence, for which Heimback claimed Wade "was unable to provide substantive accountability as to her whereabouts and activities;" and (3) Wade's explanations for the August 15 incident, which Heimback called "intentionally deceitful."  *Id.*  Around the same time, Heimback, Chambers, and LaGrand-Moorehead jointly submitted a recommendation to the corporate office to fire Wade, grounding the recommendation in Wade's lack of improvement in performance and stating that Wade was "not a good fit" for the Center.  Doc. [73-12].  It appears that the recommendation to fire Wade was a joint effort among Heimback, Chambers, and LaGrand-Moorehead, see Docs. [78] ¶ 91 and [80-2] at 65:4–7, though Heimback initiated the decision, Doc. [91] ¶ 354.

Elizabeth McSweyn, a corporate HR manager, received the recommendation to fire Wade.  In an August 16 email, she asked LaGrand-Moorehead to amend the recommendation to clarify that Wade's firing was based on insubordination.  Doc. [73-14] at 1–2.  This was apparently because the recommendation originally summarized that Wade "ha[d] not improved her performance," which, according to McSweyn's email, may not alone have warranted firing Wade, while insubordination did.  *Id.*  In that email, McSweyn articulated that she did not "want to open the door for performance concerns and a second chance."  *Id.*  That same day, Chambers, Heimback, LaGrand-Moorehead, and McSweyn signed a revised recommendation providing insubordination as the basis for the decision.  Corporate approved the request to fire Wade on

5

August 17, 2017.  Docs. [73-13], [78] ¶ 100.  Wade subsequently brought this suit, arguing that Defendants violated the MHRA by firing her for reporting the employee's sexual harassment complaint.

## II.     **Legal Standards**

"A court must grant a motion for summary judgment if the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  "The movant bears the initial responsibility of informing the district court of the basis for its motion and must identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Id.* at 996; *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude" summary judgment. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1002 (8th Cir. 2011) (quoting *Liberty Lobby*, 477 U.S. at 248).

The Court must view the evidence in the light most favorable to the nonmoving party and give her the benefit of all reasonable inferences. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Where there is sufficient evidence supporting a factual dispute, it is up to the jury to resolve the dispute at trial. *Liberty Lobby*, 477 U.S. at 248–49.  A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*  "Under Missouri law, '[s]ummary judgment seldom should be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence.'" *Wierman*, 638 F.3d at 1002 (alteration in original) (quoting *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664–65 (Mo. banc 2009)).  But there

6

is no "discrimination case" exception to summary judgment, and such cases are not immune from summary judgment. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) ("Although employment discrimination cases are 'often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment.'" (quoting *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011))).

For summary judgment purposes, the Court's attention is focused on the legal elements of the claims at issue. Retaliation under the MHRA requires that Wade show (1) she complained of discrimination, (2) her employer took adverse action against her, and (3) there is a causal relationship between the complaint and the adverse action. *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1023 (8th Cir. 2019). The legal validity of the underlying discrimination complaint is immaterial to the success of the retaliation claim. *See Holmes v. Kansas City Pub. Sch. Dist.*, 571 S.W.3d 602, 612 (Mo. Ct. App. 2018).

Previously, Missouri courts reviewed the causal element of MHRA claims on a "contributing factor" basis. This means that a plaintiff could succeed in her MHRA claim if the prohibited act was merely one contributing part of the adverse action against her. *See, e.g.*, *Holmes*, 571 S.W.3d at 611; *Porter v. City of Lake Lotawana*, 651 F.3d 894, 898 (8th Cir. 2011) (articulating the Missouri "contributing factor" standard as permitting a plaintiff to recover as long as "her complaint of discrimination was 'a reason' for" dismissal, compared to the federal-law requirement that it be "the reason").[1] However, on August 28, 2017, an amended version of the MHRA took effect that changed the standard to the more-demanding "motivating" factor approach, similar to the federal standards under Titles VII. *See* Mo. Rev. Stat. § 213.010(2) (defining "[b]ecause" or "because of" as "the motivating factor" behind an adverse employment

---

[1] The "contributing factor" standard applies to both retaliation and discrimination claims under the MHRA. *See Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 360 (8th Cir. 2009) (citing *Hill*, 277 S.W.3d at 665).

decision); *see also Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 795 (Mo. Ct. App. 2018) (discussing Missouri's shift from the contributing to motivating factor standard). In cases similar to this one, Missouri courts have applied the version of the law in effect at the time of the claimed discriminatory act. *See, e.g.*, *Wiedner v. Ferrellgas, Inc.*, 607 S.W.3d 231, 237–39 (Mo. Ct. App. 2020); *Folsom v. Mo. State Highway Patrol*, 580 S.W.3d 645, 650 n.1 (Mo. Ct. App. 2019); *Bram*, 564 S.W.3d at 794–95. The timing of Wade's claims narrowly precedes the August 2017 amendment; as such, the Court will apply the "contributing factor" standard here.

### III. Discussion

The parties grapple primarily over the third element of Wade's retaliation claim: the existence of a causal relationship between Wade's role in reporting the sexual harassment and the decision to fire her, subject to the "contributing factor" standard. Weighing that standard along with the relevant evidence before it, the Court finds that Wade has provided sufficient evidence to create a genuine dispute of facts material to her retaliation claim.

First, though Wade and Barefield reported the sexual harassment claim in June 2017, Wade argues that Chambers was not aware of her involvement in the report until her August 9 response to the written warning. Doc. [83] at 10. Both Heimback and LaGrand-Moorehead began working at Adams in July 2017, after the June complaint, and it appears clear that neither was aware of Wade's involvement in the sexual harassment report until Wade's response to the warning. Defendants argue that Wade's response to the warning does not qualify as her complaint, see Doc. [72] at 29, but this is irrelevant. What matters instead is Wade's ability to show a causal connection between her complaint and her firing, and when her superiors discovered Wade's role in the complaint is relevant to whether such a connection exists. There is some dispute as to whether Heimback, Chambers, or LaGrand-Moorehead reviewed Wade's response to the warning and

8

whether they thereby learned of her involvement in the complaint against Chambers. *See* Docs. [72] at 24, [73-10] at 1, [83] at 10, [91] ¶¶ 346–50. Taking the facts most favorably to Wade, the Court will assume that each of Heimback, LaGrand-Moorehead, and Chambers read Wade's response to the warning and that doing so informed them of Wade's role in reporting the alleged harassment. Defendant's attempts to use Barefield as a comparator to Wade are therefore inapt. Barefield and Wade made the harassment report together, and Barefield indeed remains employed by Adams, see Doc. [78] ¶ 48. But Wade clearly alleges that Chambers retaliated against her for the harassment complaint, and Chambers was not in position to fire Barefield when he discovered who forwarded the complaint in August 2017—by then, Barefield had left the Center. *See* Doc. [91] ¶ 26; *see also Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (noting that, when assessing alleged pretext, "individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances" (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000))).

Defendants devote much attention to Wade's claimed insubordination, but Wade disputes nearly all the facts underlying Heimback's insubordination claims. To begin with, Wade contests the claims regarding misbehavior and unprofessionalism by the employees she supervised, asserting that she never observed them doing or saying any of the things Heimback claims. Doc. [78-7] ¶¶ 7–9, 14–18. Wade also disputes that she "refused" to sign Heimback's letter of expectations. Doc. [79-2] at 133:10–25. The August 10 incident, where Wade was apparently absent from the Center for four hours, particularly gives rise to credibility questions. Heimback claims that Wade could not substantiate her whereabouts whatsoever, while Wade testified that she not only explained clearly where she was but that Heimback had access to the Outlook calendar

9

reflecting that Wade was attending the outreach event that day.  Docs. [79-2] at 177:14–178:16, [67-4] at 57:23–58:6.  Finally, the August 15 incident is also in dispute, as Wade and Heimback disagree on how Wade explained the students' absences and whether it was consistent with what the admissions counselors subsequently told Heimback.  Docs. [79-2] at 179:19–180:19, [67-4] at 58:7–2, 130:6–15.

These disputes are significant.  Heimback specifically cited each of these allegations in her request to fire Wade; in fact, they make up the bulk of the proffered reasons justifying the request.  *See* Doc. [73-11].  Chambers and LaGrand-Moorehead also submitted requests to fire Wade, and, like Heimback, similarly cited Heimback's disputed claims as warranting Wade's dismissal.  *See* Docs. [73-17], [73-18].  Furthermore, McSweyn requested that the original recommendation to fire Wade, Doc. [73-12], be amended to specifically provide insubordination as the reason for dismissal on the grounds that "insubordination warrants termination."  Doc. [73-14] at 1.  And the amended recommendation is the one that ultimately was approved.  *See* Doc. [73-13].  Wade's claimed insubordination, which was based largely on Heimback's claims, thus appears to have played a substantial role in her dismissal.

While Defendants rightly point out that Heimback's honestly held, good-faith belief that Wade was being insubordinate would undermine any retaliation claim, see Doc. [72] at 21–22 and *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 934 (8th Cir. 2011), Wade's factual challenges to the bases for much of Heimback's insubordination claims call into question Heimback's credibility.  Heimback played a significant role in the decision to fire Wade and was aware of Wade's involvement in the sexual harassment complaint.  The credibility of the reasons she put forth for firing Wade is therefore significant to whether Wade's complaint "contributed to" the decision to fire her.  *See Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 50 (Mo. Ct. App. 2016)

10

(noting that evidence showing the defendant's explanation for adverse action is not credible can serve as support for a retaliatory motive); *Turner v. Kansas City Pub. Schs.*, 488 S.W.3d 719, 724 (Mo. Ct. App. 2016) ("Another form of circumstantial evidence that is probative of retaliatory motive is '[p]roof that the defendant's [proffered] explanation is unworthy of credence." (alterations in original) (quoting *Lomax v. DaimlerChrysler Corp.*, 243 S.W.3d 474, 483 (Mo. Ct. App. 2007))); *see also Ferguson v. Curators of Lincoln Univ.*, 498 S.W.3d 481, 491 (Mo. Ct. App. 2016) (noting, in an ADEA case, that a defendant's explanation, if not worthy of credence, is "probative of intentional discrimination, and it may be quite persuasive." (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000))). And it is not the Court's role on a summary judgment motion to weigh evidence or credibility. *See Wierman*, 638 F.3d at 993 (citing *Reeves*, 530 U.S. 133, 150 (2000)).

Under the contributing factor standard, Wade could succeed in her retaliation claim by simply showing that her harassment complaint played any role at all in the decision to fire her, even if there were other legitimate reasons for doing so. *Soto*, 502 S.W.3d at 48 ("A contributing factor is a condition that contributes a share in anything or has a part in producing the effect." (quoting *Turner*, 488 S.W.3d at 723)). Heimback's insubordination claims played a significant role in firing Wade, and Wade disputes the grounds on which those claims rest; it is a matter of Heimback's word against Wade's. There are no documents or evidence reflecting Heimback's views on Wade's insubordination other than those Heimback prepared after learning of Wade's role in the complaint against Chambers.[2] Notwithstanding any other legitimate reasons for firing Wade, it is plausible that a jury could hear the evidence and determine that the claimed insubordination lacks a factual foundation, giving rise to an inference of pretext for Wade's firing.

---

[2] This includes the August 2 warning, which said nothing about insubordinate behavior. *See* Doc. [73-9].

11

*See Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1033 (8th Cir. 2016) ("Although the MHRA does not require an employee to show than an employer's stated reasons for taking an adverse action were pretextual, evidence undermining the credibility of those reasons can give rise to a factual issue as to whether a discriminatory reason was a contributing factor to an employer's conduct.").

Chambers too was involved in Wade's dismissal, and Heimback testified that she was "sure" she, Chambers, and LaGrand-Moorehead met numerous times to discuss firing Wade before actually doing so. Doc. [80-2] at 65:4–11. Additionally, Chambers, Heimback, and LaGrand-Moorehead—the three individuals primarily involved in firing Wade—all discovered Wade's involvement in the sexual harassment complaint only days before deciding to fire her. While temporal proximity alone cannot create a genuine dispute of fact sufficient to defeat summary judgment, it "can create an inference of retaliation," particularly where the proximity is "very close." *See Sevege v. City of Independence, Mo.*, No. 07-481-cv-W-DW, 2009 WL 10671881, at *5 (W.D. Mo. Mar. 17, 2009) (holding temporal proximity alone was insufficient to create a reasonable inference of retaliation where the time between the protected activity and plaintiff's dismissal was seven months and the plaintiff conceded many of the issues listed in his disciplinary record). Coupled with the disputed grounds for Wade's insubordination, the proximity of Chambers, LaGrand-Moorehead, and Heimback's discovery of Wade's involvement in the complaint could permit a reasonable jury to find that Wade's sexual harassment complaint played a part—even if it was only "the straw that broke the camel's back"—in the decision to fire her. Summary judgment is therefore inappropriate on Wade's retaliation claim.

## Conclusion

There remain disputes of fact material to Wade's retaliation claims in this case. That being so, the Court denies Defendants' Motion for Summary Judgment against Wade. As with its

concurrent ruling on Defendant's Motion for Summary Judgment against Plaintiff Tambra Cross, the Court need not reference the "report cards" Defendant provided to conclude that summary judgment is inappropriate here. The Court will therefore deny Plaintiffs' Motion to Strike as moot.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on Claim Brought by Plaintiff LaShanté Wade, Doc. [71], is **DENIED**.

**IT IS FURTHER ORDERED** that, consistent with the corresponding Memorandum and Order denying Defendants' Motion for Summary Judgment against Plaintiff Tambra Cross, filed this same date, Plaintiff's Motion to Strike Contract Report Cards from Summary Judgment Record, Doc. [84], is **DENIED** as moot.

Dated this 15th day of December, 2020.

                                                    MATTHEW T. SCHELP
                                                    UNITED STATES DISTRICT JUDGE